**SO ORDERED.**

**SIGNED this 23 day of March, 2018.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                                     CASE NO. 17-03266-5-DMW

**JAMES EDWARD HELMS, JR.**
**VICTORIA MARRUJO HELMS**

                                                                                   CHAPTER 13

DEBTORS

### ORDER REGARDING VALUE OF REAL PROPERTY AND
### ORDER SUSTAINING OBJECTION TO CLAIM

This matter comes on to be heard upon the Objection to Claim filed by James Edward Helms, Jr. ("Mr. Helms") and Victoria Marrujo Helms (collectively, "Debtors") on October 10, 2017 and the Response to Objection to Claim of Internal Revenue Service filed by the United States of America, by and through the United States Attorney for the Eastern District of North Carolina, on behalf of the Internal Revenue Service ("IRS") on October 30, 2017. The court conducted a hearing in Raleigh, North Carolina on March 7, 2018. Cort I. Walker, Esq. appeared for the Debtors, and Dennis M. Duffy, Esq. appeared for the IRS. Based upon the pleadings, the testimony and other evidence presented, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtors filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on July 3, 2017 ("Petition Date").

3. The Debtors own real property ("Property") located at 105 Chalon Drive in Cary, Wake County, North Carolina. The Debtors assert the Property had a value of $620,000.00 on the Petition Date. Under its last scheduled *ad valorem* revaluation, the Wake County Revenue Department appraised the Property at $657,437.00. The Property was built in 1999, the same year of purchase by the Debtors. The Property consists of 3,712 square feet of heated area on a one-acre lot. A highway, US-64, runs alongside the rear boundary line of the Property, but the Debtors have landscaping that shields visibility of the highway from the Property.

4. The Property is encumbered by a deed of trust in favor of SunTrust Mortgage, Inc. ("SunTrust"). The Debtors estimated on Schedule D that the balance owed to SunTrust on the Petition Date was $632,833.66. According to the Proof of Claim filed by SunTrust on November 6, 2017, the Debtors' obligation to SunTrust had a balance of $654,937.50 on the Petition Date.

5. On Schedule A/B filed with the court, the Debtors listed personal property worth a total of $93,757.01, including a 2013 Dodge Caravan ("Vehicle") worth $14,500.00 and a retirement account with a balance of $5,121.13. Mr. Helms financed the purchase of the Vehicle on August 12, 2013. Wells Fargo Dealer Services has a perfected lien on the Vehicle and was owed $15,588.39 as of the Petition Date.

6. The IRS recorded a Notice of Federal Tax Lien with the Wake County Superior Court on June 10, 2014, asserting the Debtors owed the amount of $146,861.38 to the IRS. The IRS filed a Proof of Claim on August 30, 2017 asserting a claim in the total amount of $177,584.18, comprising a secured claim of $98,739.22, an unsecured priority claim of $35,793.72 and a general unsecured claim of $43,051.24. The IRS based its calculation of the secured portion of its claim on the tax value of the Property ($657,437.00), the Debtors' estimate on Schedule D of the balance owed to SunTrust as of the Petition Date ($632,833.66) and the total value of the Debtors' personal property except for the Vehicle and the retirement account, which are over-encumbered and not included in the Debtors' estate, respectively.

7. The Debtors assert they have no equity in the Property based on the amount owed to SunTrust, and that the IRS is secured only by the Debtors' personal property. The Debtors assert the IRS is secured to the extent of $74,135.88, which amount represents the total value of the Debtors' personal property except for the Vehicle and the retirement account. Using the Debtors' valuation of the Property, the IRS would have an unsecured priority claim of $35,793.72 and a general unsecured claim of $67,654.58.

8. The IRS argues that the Debtors have undervalued the Property and there is equity to secure the IRS lien, even after accounting for SunTrust's lien.

9. At the hearing, Mr. Helms testified regarding the condition of the Property and the Debtors' opinion of the value of the Property. To corroborate their opinion of the value of the Property, the Debtors presented data sheets ("Data Sheets") from the Multiple Listing Service for four properties within a mile of the Property, three of which sold in 2017 and one of which was under contract and projected to sell in March, 2018. The Debtors also presented the Account Summary of the Property maintained by the Wake County Revenue Department, an estimate for

3

repairs to the Property ("Estimate") prepared by First Choice Home Service, LLC and photographs of the roof of the Property. The court admitted the Debtors' exhibits into evidence.

10. The IRS presented testimony from Sloane Wilkinson ("Ms. Wilkinson"), a property appraiser and liquidation specialist with the IRS. In addition to her work for the IRS, Ms. Wilkinson appraises properties for the United States Department of Justice and serves as an auctioneer to facilitate the liquidation of properties for various federal government agencies. Ms. Wilkinson is not a broker or appraiser licensed by the North Carolina Real Estate Commission or the North Carolina Appraisal Board, respectively. The IRS also presented various data for the Property maintained by the Wake County Revenue Department and a document related to a 2013 loan modification between the Debtors and SunTrust. The court admitted the exhibits presented by the IRS into evidence.

11. The Debtors and Ms. Wilkinson used differing approaches to corroborate or reach their respective opinions of value for the Property. The court will examine each method before explaining why the Debtors' approach is superior.

## The Debtors' Estimation of Value

12. Mr. Helms testified that since purchasing the Property, the Debtors have not replaced or updated the roof, windows or siding of the Property, and the hardwood floors inside the Property need to be repaired. Mr. Helms testified that the Estimate itemized the estimated cost of repairs that would be necessary to sell the Property "without discounting the price" to account for deferred maintenance to the Property. The repairs listed on the Estimate include repairing or replacing the siding of the Property and repainting the exterior, repairing certain exterior windows and refinishing the hardwood floors inside the Property. The Estimate states that repairs, including requisite labor and taxes, would cost $16,999.92. The Estimate does not include any costs for

repairing the roof of the Property. Mr. Helms testified that the roof has damaged shingles, and a new roof would cost approximately $18,000.00. Mr. Helms did not account for these repairs when he valued the Property at $620,000.00, but he acknowledged that completing the repairs would likely result in the Property having a value higher than $620,000.00.

13.     Mr. Helms testified about the four properties described on the Data Sheets. Two of those properties, 105 Corsica Lane and 112 Charlemagne Court, are situated in the same neighborhood as the Property and located less than a quarter of a mile from the Property according to Mr. Helms. A property located at 314 Kettlebridge Drive is approximately half of a mile from the Property. The fourth property, 107 Drysdale Court, is approximately one mile from the Property. Mr. Helms was less familiar with that property but was able to testify as to how that property compared to the Property.

    a.     105 Corsica Lane. According to the Data Sheet provided by the Debtors, this property was built in 1992, has 3,765 square feet of living area and has a .6 acre lot size. This property sold for $603,000.00 on May 15, 2017. The listing remarks state the property has "tons of recent updates."

    b.     112 Charlemagne Court. According to the Data Sheet provided by the Debtors, this property was built in 1992, has 3,660 square feet of living area and has a .51 acre lot size. This property sold for $520,000.00 on December 8, 2017. The listing remarks state the property has a new roof, windows and fiber cement siding.

    c.     314 Kettlebridge Drive. According to the Data Sheet provided by the Debtors, this property was built in 1994, has 3,358 square feet of living area and has a .56 acre lot size. This property sold for $550,000.00 on June 5, 2017.

      d.    107 Drysdale Court. According to the Data Sheet provided by the Debtors, this property was built in 1993, has 3,749 square feet of living area and has a .3 acre lot size. At the time of the hearing, this property was listed for $525,000.00 and was under contract to be sold.

15. Mr. Helms acknowledged that the properties described in the Data Sheets all have smaller lot sizes than the Property but asserted the Property's proximity to a highway on its rear border offsets the increased value a larger lot size would otherwise bring. Mr. Helms also conceded that the Property is five to seven years newer than the properties on the Data Sheets, but asserted that at least two of those listings indicate those properties have been updated, whereas the Property has not.

The IRS' Estimation of Value

15. Ms. Wilkinson testified about the methods she employed to estimate the value of the Property. Ms. Wilkinson conducted a physical inspection of the Property, and she confirmed the Property has damage to the exterior siding and roof, and the hardwood floors on the interior of the Property show signs of wear in certain places.

16. Ms. Wilkinson stated that she examined sales data for approximately fourteen properties that were comparable to the Property in age, square footage and lot size and which sold within .6 miles of the Property under normal market conditions.[1] Ms. Wilkinson used that data to calculate an average price per square foot to apply to the Property in order to estimate its value. Ms. Wilkinson determined that the properties she examined sold at an average price per square foot of "one hundred and seventy-some dollars." Ms. Wilkinson ultimately stated, however, that she based her valuation of the Property on the Property's tax value, which she adjusted upwards

---

[1] Ms. Wilkinson testified that she did not include in the comparable sales any sales that were conducted under "short sale" or foreclosure conditions.

6

by ten percent based on a determination that across Wake County over the last twelve months, properties have sold, on average, for an amount ten percent higher than their tax value. The tax value of the Property, increased by ten percent, is $723,180.70.

17. After increasing the tax value of the Property by ten percent, Ms. Wilkinson adjusted her estimate to account for the larger lot size of the Property compared to other properties within the neighborhood. This adjustment apparently ignores the fact that the Wake County Revenue Department assigns value to lots in its assessments.[2] Ms. Wilkinson determined that the Property has a value ranging from $750,000.00 to $812,000.00.

18. The IRS presented evidence that in 2013, SunTrust entered into a loan modification with the Debtors whereby SunTrust reamortized approximately $606,000.00 owed by the Debtors to SunTrust. The IRS asserts the terms of the modification support a finding that the Property had a value significantly higher than $606,000.00 in 2013, as SunTrust would not have agreed to the modification of a loan that did not have an equity cushion. Mr. Helms testified that the amount of $606,000.00 was based on the principal balance owed to SunTrust at the time plus all unpaid amounts capitalized into a new loan. The Debtors received no cash from the loan modification.

<u>Analysis of the Competing Estimates of Value</u>

19. The court found Mr. Helms to be a credible witness with a strong knowledge of the real estate market in his neighborhood specifically. Mr. Helms competently compared the Property to the properties listed in the Data Sheets, all of which are situated within a mile of the Property. In contrast, the calculations Ms. Wilkinson performed in an effort to estimate the value of the Property are based on averages across Wake County as a whole. A reliable value cannot be

---

[2] An adjustment to account for the Property's larger lot size may have been appropriate as part of Ms. Wilkinson's estimate using the average price per square foot data to calculate the value of the Property; however, Ms. Wilkinson never explained fully the results of her valuation using average price per square foot data. According to her testimony, she applied an adjustment for lot size as part of her valuation based on the Property's tax value.

7

ascertained from the methodology employed by Ms. Wilkinson. The use of tax value as a starting point, followed by an increase based on county-wide sale trends, does not yield an accurate value. Ms. Wilkinson may have reached a dependable value if she had applied to the Property the average price per square foot data she collected by examining comparable properties in the vicinity of the Property using a sales comparative approach; however, Ms. Wilkinson never presented testimony explaining completely the application of that data. Her testimony was unlike any the court has ever received, and while potentially novel, the testimony was neither credible nor helpful.

20. The court is also perplexed why the IRS asserted the 2013 loan modification between the Debtors and SunTrust could establish or even corroborate value. The SunTrust credit administrators may have considered valuation of the Property when they agreed to the 2013 loan modification, but the IRS did not present those witnesses. Instead, the IRS asserted a baseless conclusion that SunTrust would not modify the loan if the Property did not have a substantial equity cushion. The 2013 loan modification says nothing, even remotely, about value.

21. The court finds that Mr. Helms accurately estimated the value of the Property to be $620,000.00 on the Petition Date. The comparable sales Mr. Helms described sold for between $520,000.00 and $603,000.00. Each of those properties is older than the Property and has a smaller lot size. Mr. Helms credibly testified about repairs that are needed on the Property and the disadvantages of his larger lot location. Those explanations justify Mr. Helms' determination that $620,000.00 is an accurate value for the Property in light of the differences between the Data Sheet properties and the Property.

22. The Property is encumbered fully by the lien in favor of SunTrust, and the IRS is only secured by the Debtors' personal property. The IRS has not challenged the Debtors'

valuations of their personal property, and the IRS should have a secured claim in the amount of $74,135.88; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Property had a value of $620,000.00 on the Petition Date;

2. The Objection be, and hereby is, sustained; and

3. The IRS shall have a secured claim against the Debtors in the amount of $74,135.88, an unsecured priority claim in the amount of $35,793.72 and a general unsecured claim in the amount of $67,654.58.

END OF DOCUMENT